**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

LAUSTEVEION JOHNSON,

    Plaintiff,

v.

APRIL WITTER, *et al.*,

    Defendants.

3:13-cv-00689-MMD-VPC

**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE**

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. Before the court is defendants' motion to dismiss/motion for summary judgment (#30/31) and plaintiff's opposition (#47). Having thoroughly reviewed the record and papers, the court recommends that defendants' motion be granted and denied in part.

**I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Lausteveion Johnson ("plaintiff") is an inmate in the custody of the Nevada Department of Corrections ("NDOC"). Presently, plaintiff is incarcerated at High Desert State Prison, but the alleged events giving rise to this case occurred at Ely State Prison ("ESP") in Ely, Nevada, where plaintiff was previously held. Acting *pro se*, plaintiff asserts several civil rights claims against the following ESP and NDOC officials (collectively, "defendants"): ESP Property Sergeant April Witter ("Witter"); ESP Correctional Officer Brian Lawrence ("Lawrence"); ESP Senior Officer Manning ("Manning"); ESP Correctional Officer C. Thompson ("Thompson"); ESP Correctional Officer Pickering ("Pickering"); ESP Associate Warden Harold Byrne; ESP Associate Warden A.J. Watson; ESP Warden Renee Baker; ESP Caseworker M. Oxborrow; NDOC Deputy Director Sheryl Foster;

-1-

NDOC Medical Director R. Bruce Bannister; G. Carpenter; Jon Garner; C. Schardin; and ESP Lieutenant John Doe. (#5 at 15, 18). Plaintiff seeks damages and declaratory and injunctive relief against each defendant in his or her individual and official capacities.

On February 25, 2014, the Court entered a screening order (#5). Under the screening order, three counts remain in this action, all styled as civil rights violations pursuant to 42 U.S.C. § 1983. First, plaintiff alleges First Amendment retaliation against Witter, Manning, Thompson, and Pickering. (#5 at 9-10). Second, against all defendants, plaintiff alleges Eighth Amendment deliberate indifference to his medical needs. (*Id.* at 12-14). Finally, plaintiff alleges a procedural due process violation under the Fourteenth Amendment against Manning, Lawrence, and Witter. (*Id.* at 15). On March 3, plaintiff moved for a preliminary injunction (#6), and the Court denied the motion on March 14 (#18). On July 22, defendants moved to dismiss, or in the alternative, for summary judgment (#30/31). Plaintiff opposed on September 16 (#47).

The alleged events precipitating plaintiff's claims occurred at ESP in October and November 2012. The parties offer competing versions of the events, but the essential course of occurrences is as follows. On October 3, 2012, plaintiff and his cellmate at the time, inmate Larry Mingo ("Mingo"), were to undergo a change in their respective cellmates. The parties dispute whether the change was at the inmates' requests. (*Compare* #5 at 6-7 *with* #30 at 2). In either case, plaintiff was to remain in his current unit and Mingo would be rehoused in another cell. When defendants Manning and Lawrence arrived at the cell to move Mingo, they collected the personal property of both inmates, discarded items they regarded as trash, and delivered the remaining items to the ESP property room for sorting and return to each inmate at a later time. (#30 at 2; #5 at 7). Among plaintiff's belongings were several food items, legal papers, clothing, and, allegedly, a bottle of hypertension medication that contained an unknown number of pills. (#5 at 7, 15).

Plaintiff claims that he informed Manning, while Manning and Lawrence collected the inmates' belongings, that plaintiff had high blood pressure and that without the hypertension medication defendants had confiscated,[1] he was at increased risk of a heart attack. (*Id.* at 7). Nevertheless, Manning and Lawrence refused to return the medication, according to plaintiff, and he suffered a heart attack on October 7 because he was unable to medicate. (*Id.* at 8; *see also* #30-5 at 3). In contrast, defendants contend that plaintiff's bottle of hypertension pills was actually empty (#30 at 3), as he had not refilled the prescription in several months (#32 (sealed medical records)).[2] In addition, defendants dispute plaintiff's allegation that he had a heart attack on October 7, 2012, as he made no mention of the alleged heart attack in a medical kite he submitted on October 7. (*See id.*). Additionally, medical records from care appointments in the days and weeks following October 7 indicated no abnormalities or change of condition that would evidence a major health event, and plaintiff repeatedly refused an echocardiogram that would have detected any cardiac abnormalities. (*See id.*; *see also* #30-8).

Following the separation on October 3, plaintiff filed a grievance that sought the return of his property. (#30-5 at 2-3). Defendant Byrne responded to plaintiff. He advised plaintiff that, rather than a grievance form, he needed to complete and file an "Inmate Property claim form and proof of ownership . . . ." (*Id.* at 4). As the grievance proceeded to the first and second levels, plaintiff repeatedly stated his desire for the return of property that allegedly had not been returned to him. (*Id.* at 5, 7-8). Plaintiff alleged in the final step that defendant Witter had expressly stated that she

---

[1] Plaintiff's papers state that defendants Manning and Lawrence confiscated the medication (*see* #5 at 7), but plaintiff stated in a grievance, filed several days later, that defendants had thrown the pills into the trash (#30-5 at 3).

[2] Relatedly, during a medical examination on October 8, ESP medical staff instructed plaintiff that he must begin regularly refilling his medication. They further informed him that his continuing failure to do so would result in his removal from the "keep on person" status by which he was able to keep the pills in his cell. (#32). In addition, when responding to a medical kite on October 9, medical staff again reminded plaintiff that he had not refilled his medication in three months and that he should do so by submitting a medical kite requesting a refill. (*Id.*).

was delaying return of the personal belongings because plaintiff continued to grieve the issue. (*Id*. at 8).

On October 15, 2012, plaintiff sent a medical kite to request a refill of his hypertension medication, in apparent accordance with an earlier instructions from ESP medical staff. He received a thirty-day supply on October 16. (#32). Two weeks later, on October 29, defendants Manning, Thompson, and Pickering searched plaintiff's and others' cells as part of "laundry inventory" searches, which aimed to uncover any contraband inmates may have been hiding. (#5 at 11; #30-4 at 3; #30-11 at 2). Plaintiff asserts that Manning ordered Thompson and Pickering to confiscate his hypertension medication in retaliation for the grievances he had filed about these matters. (#5 at 11; #30-13 at 2). In an affidavit, Manning stated that he neither ordered Thompson and Pickering to take, nor saw either of them take, plaintiff's medication. (#30-4 at 3). After the alleged confiscation, on November 3, plaintiff allegedly suffered a second heart attack because he was again unable to medicate. (#5 at 11). As with the earlier cardiac event, a medical kite plaintiff submitted the following day made no mention of the occurrence. (*See* #32). Progress notes from a chronic care visit on November 10 similarly contain an absence of abnormal findings. (*See id*.).

## II.   LEGAL STANDARD

Summary judgment allows the court to avoid unneeded trials. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). The court properly grants summary judgment when the record discovered by the parties demonstrates that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not

be counted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986). A dispute is "genuine" only where a reasonable jury could find for the nonmoving party. *Id.* Therefore, conclusory statements, speculative opinions, pleading allegations, or other assertions uncorroborated by facts are insufficient to establish a genuine dispute. *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996). At this stage, the court's role is to verify that reasonable minds could differ when interpreting the record; the court does not weigh the evidence or determine its truth. *See Schmidt v. Contra Costa Cnty.*, 693 F.3d 1122, 1132 (9th Cir. 2012); *Nw. Motorcycle Ass'n*, 18 F.3d at 1472.

Summary judgment proceeds in burden-shifting steps. A moving party who does not bear the burden of proof "need only prove that there is an absence of evidence to support the non-moving party's case[,]" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010), and such a party may additionally produce evidence that negates an essential element of the nonmoving party's claim or defense, *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Ultimately, the moving party must demonstrate, on the basis of authenticated evidence, that the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party as to disputed material facts. *Celotex*, 477 U.S. at 323; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). The court views all evidence and any inferences arising therefrom in the light most favorable to the nonmoving party. *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014).

Where the moving party meets its burden, the nonmoving party must "designate specific facts demonstrating the existence of genuine issues for trial. This burden is not a light one." *In re Oracle Corp.*, 627 F.3d at 387 (internal citation omitted). "The non-moving party must show more than the mere existence of a scintilla of evidence. . . . In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (internal citations omitted). The nonmoving party may defeat the summary judgment motion

only by setting forth specific facts that illustrate a genuine dispute that requires a factfinder's resolution. *Liberty Lobby*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. Although the nonmoving party need not produce authenticated evidence, Fed. R. Civ. P. 56(c), mere assertions, pleading allegations, and "metaphysical doubt as to the material facts" will not defeat a properly-supported and meritorious summary judgment motion, *Orr*, 285 F.3d at 783.

## III. DISCUSSION

### A. Civil Rights Claims Under § 1983

42 U.S.C. § 1983 aims "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (quoting *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000)). The statute "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights[,]" *Conn v. Gabbert*, 526 U.S. 286, 290 (1999), and is "merely . . . the procedural device for enforcing substantive provisions of the Constitution and federal statutes," *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Claims under § 1983 require the plaintiff to allege (1) the violation of a federally-protected right by (2) a person or official who acts under the color of state law. *Warner*, 451 F.3d at 1067. Further, to prevail on a § 1983 claim, the plaintiff must establish each of the elements required to prove an infringement of the underlying constitutional or statutory right.

### B. Defendants' Standing Argument

Before considering each of plaintiff's substantive claims and defendants' corresponding arguments for summary judgment, the court pauses to address defendants' apparent argument that plaintiff lacks article III standing as to each of his claims because he did not suffer heart attacks, as he alleged. Although the argument is without merit, the court addresses it.

Standing ensures that federal courts operate within their constitutionally prescribed roles, and preside over only those justiciable "cases and controversies" appropriate for judicial resolution. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). The standing inquiry asks whether the litigant has "'such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'" *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975). In service of this end, standing requires that a plaintiff demonstrate a legally cognizable injury that is traceable to the actions (or inactions) of the defendant, and also that the remedies available to the court can adequately redress those harms. *Id.* at 560. Only when these elements are absent does the court lack jurisdiction.

Because the plaintiff's burden of proving each of standing's three elements varies with the requirements applicable at each stage of litigation, *id.* at 561, an allegation of injury at the summary judgment stage is insufficient to establish standing. Yet the purpose of the injury requirement is to verify that the plaintiff has suffered an invasion of his "legally protected interests"—that is, an injury sufficiently definite and particular such that the law recognizes that a bona fide personal harm has occurred. *Id*. The injury showing eliminates frivolous lawsuits that complain only of generalized grievances common to all members of the public. *Id.* at 575 (discussing *United States v. Richardson*, 418 U.S. 166 (1974)). In other words, the injury requirement examines the quality and nature of the alleged harm, rather than whether the harm actually occurred. When a harm alleged by the plaintiff plainly falls within the broad categories of harms to those interests that federal courts recognize as legally protected, assertions that the plaintiff has not suffered the injury alleged speak more readily to the substantive elements of particular claims and doctrines, rather than the constitutional powers of the federal courts. This is why, when federal courts grants summary judgment on the basis that an alleged injury did not occurred, they typically do so on the merits, rather than upon jurisdictional

grounds. As this discussion implies, there are no genuine standing issues in this case. Each of plaintiff's alleged injuries are cognizable under the particular constitutional doctrine, and thus satisfy the injury requirement.

Moreover, defendants' standing argument is fatally narrow. As the court understands defendants' motion, the fact plaintiff did not suffer heart attacks, as he alleges, somehow denies the court jurisdiction over each of his claims. (*See* #30 at 8). The absence of the cardiac occurrences speak to only to the Eighth Amendment claims; even if this absence created a standing issue, it would not do so for plaintiff's First and Fourteenth Amendment claims. Thus, even if the court agreed with defendants' contentions, it is inapposite for two-thirds of the claims in this case.

## C.  First Amendment Retaliation Claims

It is well-established in the Ninth Circuit that prisoners may seek redress for retaliatory conduct by prison officials under § 1983. *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2004); *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009). An inmate's protection from retaliation for spoken complaints, prison grievances, and other constitutionally-protected speech activity arises under the First Amendment. *See Rhodes*, 408 F.3d at 567 (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). A retaliation claim has five elements in the prison context: (1) a state actor committed an adverse action against the inmate; (2) because of; (3) the prisoner's protected First Amendment conduct, such as the grievance filing; (4) the state action chilled the inmate's exercise of his First Amendment rights; and (5) the action did not reasonably advance a legitimate correctional goal. *Id.*

As to the second element, the plaintiff must show his First Amendment activity was "the 'substantial' or 'motivating' factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989). The evidence establishing such a motive is often circumstantial. *See id.* To satisfy the fourth

element, the inmate's speech activity need not be wholly deterred. As the Ninth Circuit has observed, "[s]peech can be chilled even when not completely silenced." *Id*. at 568. Therefore, the element objectively considers "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).

The court recommends that defendants' motion for summary judgment on this count be denied. As a preliminary matter, the court observes that defendants address retaliation theories for nearly all of the events alleged by plaintiff. However, under the language of the Court's screening order, only the October 29 incident involving Manning, Pickering, and Thompson, as well as the alleged delay by Witter in returning plaintiff's personal belongings, remain in this case as retaliation claims. (#5 at 9-10). Accordingly, the court discusses solely these surviving claims. Defendants argue that plaintiff will be unable to establish each element of a retaliation claim because he has no evidence of causation, chilling of his speech, or a lack of defendants' legitimate penological goal. (#30 at 9-10). For evidentiary support, the arguments rely on the affidavit of Manning, who attests that neither he nor Thompson and Pickering took plaintiff's medication on October 29 (#30-4 at 3), and also a log that indicates that the visit to plaintiff's cell was part of "laundry inventory" searches of plaintiff's cell and other nearby cells (#30-11 at 2).

As to Manning, Thompson, and Pickering, this evidence does not foreclose a reasonable jury from finding in plaintiff's favor. First, that plaintiff has continued litigating heavily against prison officials in other cases since these alleged events does not foreclose a jury from finding in his favor on the chilling-of-speech element. *Mendocino Envtl. Ctr.*, 192 F.3d at 1300. Second, as to the lack of a legitimate penological goal, defendants articulate no argument that the alleged confiscation of

plaintiff's medication on October 29 served a legitimate penological goal. Thus, defendants have failed to satisfy their burden under Rule 56 and the motion is properly denied on that basis.

Moreover, the evidence defendants have submitted regarding causation—and, relatedly, the non-occurrence of an adverse action—does not demonstrate an absence of genuine factual disputes. Medical records establish that plaintiff likely had hypertension medication in his possession on October 29, as he had refilled the prescription only two weeks prior. (*See* #32). Accordingly, interpreting the evidence in a light most favorable to him, plaintiff likely possessed a two-week supply of pills on October 29.

The evidence also supports the inference that some type of "incident" occurred on October 29. A second-level response to plaintiff's grievance about the inventory search stated that ESP medical staff had researched the issue and, although no evidence suggested that plaintiff suffered a heart attack, he was "reissued [his] pills shortly after the incident." (#30-13 at 13). A jury could infer from the concession that plaintiff was "reissued" medication that the pills he likely possessed on October 29 had, in fact, been taken from his person by Manning, Pickering, and Thompson. This version of events is bolstered by the fact that plaintiff, despite earlier warnings, was allowed to keep medication on his person as of the relevant date; ESP officials did not rescind his keep-on-person status until December 11, 2012. (*See* #32).

On its face, the shift log suggests a non-retaliatory purpose for the October 29 visit. Yet the described purpose of the visit does not eliminate the possibility that the laundry inventory search of plaintiff's cell was a mere ruse for the alleged retaliatory action. The other searches that occurred in temporal and physical proximity may also be façades for the officers' retaliatory confiscation. Relatedly, even if the court accepts that the purpose of the search was legitimate and not intended to provide cover to Manning, Thompson, and Pickering, the mere description of the visit is not

inconsistent with the possible decisions by Manning, Pickering, or Thompson, at the moment they arrived at plaintiff's cell for the search, to take his medication in retaliation for his voluminous grievances. Therefore, the court is left only with the affidavit of Manning, in which he stated that the officers took no retaliatory actions on October 29. Plaintiff's opposition contests that explanation. The issue is one of credibility, and this court may not resolve credibility at the summary judgment stage.[3] *Schmidt*, 693 F.3d at 1132.

The retaliation claim against Witter turns on whether she held or delayed returning any of plaintiff's personal belongings after October 3 to retaliate against him for the grievances he filed. (#5 at 5-6). As with the claims against the correctional officers, defendants' brief offers only irrelevant arguments: in short, they maintain that plaintiff cannot show that Witter withheld his medication in retaliation because, as of October 3, 2012, plaintiff possessed no medication that could have been confiscated. (#30 at 10). However true this argument might be, it miscomprehends the claim the Court framed in the screening order. The retaliation claim against Witter centers on whether she withheld *any* of plaintiff's personal property for retaliatory reasons after it was removed from plaintiff's cell on October 3. Defendants have offered no arguments or evidence relating to the withholding of plaintiff's personal belongings by Witter. Accordingly, they have failed to meet their burden under Rule 56 and are not entitled to summary judgment.

**D.   Eight Amendment Deliberate Indifference Claims**

The Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency" by prohibiting imposition of cruel and unusual punishment by state actors. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). The Constitution's stricture on the

---

[3] The court also notes that plaintiff has not yet had an opportunity for discovery on his claims (*see* #48 at 5), as defendants have moved for summary judgment when answering the Complaint. It is entirely possible that, with the opportunity to depose defendants and obtain other evidence, plaintiff can amass further evidence to support his version of the facts.

"unnecessary and wanton infliction of pain" encompasses deliberate indifference by state officials to the medical needs of prisoners. *Id.* at 104. It is well-settled law that "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Id.* at 105.

In the Ninth Circuit, deliberate indifference claims are analyzed under a two-part test. "In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show . . . . an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Colwell*, 763 F.3d at 1066 (quoting *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012)) (internal citations and quotation marks omitted). The objective component examines whether the plaintiff has a "serious medical need," such that the state's failure to provide treatment could result in further injury or cause unnecessary and wanton infliction of pain. *Jett v. Penner*, 439 F.3d 1090, 1096 (9th Cir. 2006). Serious medical needs are those "that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities' or the existence of chronic and substantial pain." *Colwell*, 763 F.3d at 1066 (citation and internal punctuation omitted).

The subjective element considers the defendant's state of mind and whether the plaintiff was harmed. Only where a prison "official 'knows of and disregards an excessive risk to inmate health and safety'" is the subjective element of the test satisfied. *Id.* (quoting *Toguchi v. Chung*, 391 F.3d 1050, 1057 (9th Cir. 2004)). The conduct must consist of "more than ordinary lack of due care." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Not only must the defendant prison official have actual knowledge from which he or she can infer that a substantial risk of harm exists, but he or she must also draw that inference." *Id.* at 837. The standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other[,]" *id.* at 836, and does not include

"accidental or unintentional failures to provide adequate medical care . . . ," *Estelle*, 429 U.S. at 105. Finally, the plaintiff must prove that he was harmed by the indifferent actions, though the harm need not be substantial. *Jett*, 439 F.3d at 1096.

The court recommends that summary judgment be granted for all defendants on plaintiff's Eight Amendment claims. In short, the medical records produced by defendants indicate that plaintiff suffered no heart attacks on October 7 and November 3. In his opposition, plaintiff does not suggest the existence of additional medical records that evince that these cardiac arrests occurred. As no reasonable jury can find from the evidence that plaintiff was harmed from defendants' actions—even assuming that his pills were, in fact, taken—plaintiff's claims necessarily fail. *Jett*, 439 F.3d at 1096.

**E.     Fourteenth Amendment Procedural Due Process Claims**

The Due Process Clause of the Fourteenth Amendment forbids deprivations of property without due process of law. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Prisoners have a constitutionally protected interest in their personal property. *Hansen v. May*, 502 F.2d 728, 730 (9th Cir. 1974). "A § 1983 action may be brought for a violation of procedural due process," but the constitutional violation is the state's failure to provide due process when making the deprivation, rather than the deprivation itself. *Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990). Therefore, "it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry . . . examine[s] the procedural safeguards built into the statutory or administrative procedure effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." *Id.*

Courts distinguish between unauthorized deprivations and authorized, intentional deprivations. Where a meaningful post-deprivation remedy is available, neither negligent nor

intentional unauthorized deprivations of property by prison officials are actionable under § 1983. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Quick v. Jones*, 754 F.2d 1521, 1524 (9th Cir. 1985). This District has held on a prior occasion that the State of Nevada's small claims process provides adequate post-deprivation relief for the unauthorized deprivation of inmate property. *See Matthews v. Ambridge*, No 2:12-cv-01004-PMP-CWH, 2012 WL 6589264, at *4 (D. Nev. Dec. 17, 2012). However, an authorized, intentional deprivation of property is actionable under the Due Process Clause even where post-deprivation remedies exist. "Authorized" deprivations are those carried out pursuant to a state's established procedures, regulations, or statutes. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435-36 (1982). In addition, when state officials act under the apparent authority of state procedures, regulations, or statutes, "deliberate, considered, planned, or prescribed conduct" that amounts to a property deprivation violates the Fourteenth Amendment, whatever the availability of post-deprivation relief. *See Piatt v. MacDougall*, 773 F.2d 1032, 1036 (9th Cir. 1985).

Moreover, the prison environment may limit due process considerations. The Supreme Court has explained that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Sandin v. Conner*, 515 U.S. at 472, 482 (1995). Therefore, legitimate penological objectives may limit procedural requirements. *Turner v. Safley*, 482 U.S. 78, 89-90 (1987); *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999). So long as a prison policy is reasonably related to a legitimate penological goal, no constitutional violation arises. *Frost*, 197 F.3d at 354. The inquiry has four considerations: (1) a valid, rational connection between the prison policy and the articulated interest; (2) the presence of alternative means for the inmate to exercise the right; (3) the impact of accommodating the right upon guards, other inmates, and prison resources; and (4) the absence of ready alternatives. *Id*. To contest a prison's explanation of a

legitimate goal, the inmate must present sufficient evidence to refute "a common-sense connection between a legitimate objective and a prison regulation . . . ." *Id*. at 357.

The court concludes that Manning and Lawrence are entitled to summary judgment on the due process claims. Defendants have produced an affidavit by Manning explaining that, given the perceived emergency situation, plaintiff's property was taken for sorting at the property room. In his words, Manning "decided that all items of obviously valuable personal property should be collected and sent to the property room" where "property room staff could separate the property based on each inmate's registered inventory sheets." (#30-4 at 2). Additionally, he indicated that officers typically discard any items they deem to be "trash" when separating inmates for cell moves. (*Id*.). These are unquestionably legitimate penological objectives. To the extent that the taking of property by Manning and Lawrence on October 3 constituted a deprivation, legitimate penological goals render such deprivation constitutionally firm. *Frost*, 197 F.3d at 354. Although the deprivation may have been authorized, it is reasonably related to legitimate prison goals of defusing violence and properly separating the belongings of plaintiff and Mingo to avoid any disputes.

Thus, if any constitutional violation occurred, it can rest only in the failure to return plaintiff's belongings after October 3, 2012. Plaintiff contends that Witter delayed the return of his belongings and failed to return a portion thereof, which the court addresses more fully below. Yet that deprivation arises only in Witter's actions, rather than those of Manning and Lawrence. Accordingly, even if they facilitated her actions in their October 3 cell removal, they are not liable for an authorized deprivation. Further, regarding any discarded food items, Manning stated in his affidavit that "[i]t is standard practice when facilitating a move such as this to throw away any obvious trash." (#30-4 at 2) (emphasis added). This, too, is a legitimate penological goal; plaintiff is not entitled to a due process hearing before prison staff discard apparently rotting food and other

trash collecting in his cell.  To the extent than Manning or Lawrence incorrectly deemed any items as waste, the deprivation was an unauthorized one, for the applicable policy is one allowing disposal only of trash; therefore, mistakes are not constitutional violations.  At bottom, Nevada's small claims relief absolve Manning and Lawrence of § 1983 liability for any deprivations that may have occurred through their actions.  *Hudson*, 468 U.S. at 533; *Matthews*, 2012 WL 6589264, at *4.

Witter is also entitled to summary judgment.  The court concludes that defendants' explanation of the delay in the returning plaintiff's property—seeking to review the inventory sheets and return to each inmate that which was his—is part of a legitimate penological goal.  As the evidence establishes, defendants acted with haste to diffuse a seemingly tense situation between plaintiff and Mingo, and subsequently aimed to ensure that each inmate received back only the property that belonged to him, likely to prevent further discord between the two men.  As plaintiff concedes, Witter returned many of his belongings on October 15; to the extent that the twelve day delay constitutes a "deprivation," the court concludes that the evidence establishes that defendants had a legitimate penological goal for depriving plaintiff of his belongings for this time period.

Regarding the items that Witter did not return, plaintiff does not allege that Witter misplaced or discarded any of these items pursuant to an official policy.  Therefore, any failure on her part was not constitutionally infirm, given the post-deprivation remedies available to plaintiff.  *Hudson*, 468 U.S. at 533; *Matthews*, 2012 WL 6589264, at *4.  Plaintiff's recourse for his lost belongings is not in federal court; it is in a small claims action.

**F.**     **Qualified Immunity**

The Eleventh Amendment bars damages claims and other actions for retroactive relief against state officials sued in their official capacities.  *Brown v. Oregon Dep't of Corrs.*, 751 F.3d 983, 988-98 (9th Cir. 2014) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100

(1984)).  State officials sued individually may also be protected from civil liability for money damages by the qualified immunity doctrine.  More than a simple defense to liability, the doctrine is "an entitlement not to stand trial or face other burdens of litigation . . ." such as discovery.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

When conducting a qualified immunity analysis, the court "ask[s] (1) whether the official violated a constitutional right and (2) whether the constitutional right was clearly established."  *C.B. v. City of Sonora*, 769 F.3d 1005, 1022 (9th Cir. 2014) (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009)).  Whether the right is established considers whether a reasonable official in the defendant's position should have known at the time that his conduct was constitutionally infirm.  *Anderson v. Creighton,* 483 U.S. 635, 639-40, (1987); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012).  The court may analyze the elements of the test in whatever order is appropriate under the circumstances of the case.  *Pearson*, 555 U.S. at 240-42.

"[T]he prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes."  *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (quoting *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995)).  Accordingly, the court rejects defendants' argument that Manning, Pickering, Thompson, and Witter are entitled to qualified immunity.

## VI.   CONCLUSION

Based upon the foregoing, the court concludes that defendants are entitled to summary judgment on plaintiff's Eighth and Fourteenth claims.  With respect to count I, defendants have not offered evidence that demonstrates an absence of factual disputes or defeats the ability of plaintiff to prove retaliatory causation.  Defendants are entitled to summary judgment on count II because no reasonable jury could find that plaintiff suffered heart attacks.  Therefore, plaintiff will be unable to

demonstrate injury or harm, as required in Eighth Amendment deliberate indifference claims. Finally, defendants are entitled to summary judgment on count III because any deprivations that occurred were unauthorized; therefore, post-deprivation relief provided by the State of Nevada shields defendants from constitutional claims.

The parties are advised:

1.  Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.  This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

### VII.   RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#30/31) be **GRANTED** as to Counts II and III, the Eighth and Fourteenth Amendment claims;

**IT IS FURTHER RECOMMENDED** that defendants' motion (#30/31) be **DENIED** as to Count I, the First Amendment claims against Manning, Thompson, Pickering, and Witter.

**DATED:**   January 26, 2015.

_____
**UNITED STATES MAGISTRATE JUDGE**